**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TINIAN WOMEN ASSOCIATION;
GUARDIANS OF GANI; PAGANWATCH;
CENTER FOR BIOLOGICAL DIVERSITY,
    *Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF THE
NAVY; RAY MABUS, Secretary of the
Navy; UNITED STATES DEPARTMENT
OF JUSTICE; UNITED STATES
DEPARTMENT OF DEFENSE; PATRICK
SHANAHAN, Acting United States
Secretary of Defense,
    *Defendants-Appellees.*

No. 18-16723

D.C. No.
1:16-cv-00022

OPINION

Appeal from the United States District Court
for the District of the Northern Mariana Islands
Ramona V. Manglona, Chief District Judge, Presiding

Argued and Submitted February 3, 2020
Honolulu, Hawaii

Filed September 18, 2020

Before:  M. Margaret McKeown, Andrew D. Hurwitz,[*] and
Bridget S. Bade, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[**]

### Environmental Law / Standing

In an action challenging the U.S.-Japan Alliance Agreement, concerning the relocation of troops from Okinawa, Japan to Guam, and the mandated environmental reviews, the panel:  (1) affirmed the district court's summary judgment in favor of the U.S. Department of the Navy on plaintiffs' procedural claim under the National Environmental Policy Act ("NEPA"); and (2) affirmed the dismissal, but for lack of standing, rather than on the basis of political question, of plaintiffs' claim that the Navy failed to consider relocation alternatives beyond Guam and the Commonwealth of the Northern Mariana Islands ("CNMI").

Plaintiffs alleged two procedural claims under NEPA with respect to the Navy's decision to relocate troops to Guam and to construct training facilities on the CNMI.  First, plaintiffs argued that the two decisions were "connected actions" that must be assessed in a single environmental

---

[*] Judge Hurwitz was drawn to replace Judge Farris.  He has read the briefs, reviewed the record, and listened to the audio of the oral argument.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

impact statement ("EIS"). Second, plaintiffs argued that "cumulative impacts" must be addressed in the Relocation EIS. The panel affirmed the district court's rejection of these claims.

First, the panel held that the Marines' relocation and the placing of training facilities on Tinian Island in the CNMI were not connected for the purposes of an EIS. Although the two actions have overlapping goals, where Marines on Guam will certainly take advantage of the training ranges and facilities in the CNMI, they also have independent utility.

Second, the panel held that the Navy's deferral of consideration of the cumulative impacts to a future EIS was not error. By issuing a notice of intent to prepare an EIS for the training and ranges in the CNMI, the Navy has impliedly promised to consider the cumulative effects of the subsequent action in the future EIS and the Navy should be held to that promise.

The panel held that plaintiffs' remaining claim – that the Navy failed to consider stationing alternatives beyond Guam and the CNMI for Marines relocating out of Okinawa – also failed. Specifically, the panel held that plaintiffs' claim was not redressable by the judicial branch and must be dismissed for lack of standing. Plaintiffs correctly identified the right to a procedurally-sound EIS that serves as a safeguard to its numerous interests on Guam and the CNMI; but plaintiffs did not – and could not – show that this right, if exercised, could protect its concrete interests, because doing so would require the panel to order the Navy to modify or set aside the Agreement between the United States and Japan.

Finally, the panel held that the district court did not err in concluding that plaintiffs waived a third claim – that defendants failed to supplement the Relocation Final EIS.

## COUNSEL

David L. Henkin (argued), Earthjustice, Honolulu, Hawaii, for Plaintiffs-Appellants.

Thekla Hansen-Young (argued), Andrew C. Mergen, Joshua Wilson, and Taylor Ferrell, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice; Craig D. Jensen, Associate General Counsel (Litigation); Cara M. Johnson, Attorney; United States Department of the Navy, Washington, D.C.; for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

This case surfaces in the wake of the Navy's decision to relocate troops from Okinawa, Japan to Guam, pursuant to treaty obligations with Japan. In October 2005, the United States and Japan signed the U.S.-Japan Alliance Agreement (the "Agreement") to "adapt [their] alliance to the changing regional and global security environment," resulting in the determination to move Marine troops from Okinawa to Guam. The Agreement was followed by a series of mandated environmental reviews, challenged here by the Tinian Women Association and other environmental groups (collectively, "TWA"). The district court properly granted

summary judgment in favor of the Navy on TWA's procedural claim under the National Environmental Policy Act ("NEPA") because the Navy's action was not arbitrary, capricious, or otherwise an abuse of discretion.  The district court dismissed as a political question TWA's claim that the Navy failed to consider relocation alternatives beyond Guam and the Commonwealth of the Northern Mariana Islands ("CNMI").   We affirm that dismissal, but for lack of standing, concluding that the claim is not redressable because it would require renegotiation of the treaty.

## BACKGROUND

*The U.S.-Japan Alliance Agreement*.  The Agreement aims to strengthen the countries' long-standing security alliance by realigning American forces in Japan to reduce "burdens on local communities, including those in Okinawa."   Consequently, the United States agreed to relocate approximately 8,000 Marines—including relocating the headquarters of the III Marine Expeditionary Force to Guam, with Japan providing more than $6 billion in funding.[1] The two countries also planned to expand bilateral training throughout Japan and the Pacific.  The United States and Japan memorialized these commitments in a February 2009 treaty that specifically provides that the "Government of the United States of America shall consult with the Government of Japan in the event that the Government of the United States of America considers changes that may

---

[1] A Marine Expeditionary Force (MEF) is the largest Marine Air Ground Task Force group, and is comprised of a MEF Headquarters Group, Marine Division, Marine Air Wing, and Marine Logistics Group. Over time the number of Marines fluctuated between 8,000–8,500.

significantly affect facilities and infrastructure funded by Japanese cash contributions."

In preparation for relocation of the Marines forces, the Navy established the Joint Guam Program Office ("JGPO") to "facilitate, manage, and execute requirements associated with the rebasing of Marine Corps assets from Okinawa to Guam." Meanwhile, the Department of the Navy instructed the Marines to identify operational and training requirements for the relocating troops, both on Guam and the CNMI.

*Environmental Impact Statements.* Before moving forward with projects that can significantly alter the environment, federal agencies are obligated to produce an environmental impact statement ("EIS"). With these requirements in mind, the JGPO began defining the EIS's scope: to study the effects of relocating approximately 8,000 Marines and their dependents from Okinawa to Guam ("Relocation EIS"). In 2007, the Navy published a notice of intent to prepare an EIS, explaining that "[t]he purpose and need of the proposed action is to fulfill U.S. government national security and alliance requirements in the Western Pacific Region."

Internal debate about the scope of the relocation roiled, as the Marine Corps and the United States Pacific Command consistently emphasized that individual and small unit training facilities were inadequate for the Marines to meet training requirements. But the JGPO believed that larger scale combined-level training was "beyond the scope of what [it] [wa]s required to build for the relocating forces," and declined to plan for such training unless it would not materially impact the environmental review process.

The Secretary of the Navy resolved the clash in 2009. He acknowledged that "[t]he current scope of the

[Relocation] EIS is unacceptable, does not meet USMC requirements, and potentially jeopardizes USMC Core Competencies in the Pacific." But the Secretary ultimately concluded that the Marines' proposal to establish expanded training capabilities in the region required a "holistic assessment" of troop levels that should not be undertaken "in a series of 'knee-jerk' decisions that may not necessarily be tied together or complementary with long term U.S. strategy."

The Navy issued the Relocation EIS in July 2010, which addressed the relocation of approximately 8,000 Marines to Guam, including the development and construction of training facilities on Guam and Tinian, one of the three principal islands of the CNMI. The EIS analyzed several proposed training facilities, including one live-fire training range complex on Guam, and four training ranges on Tinian. The five ranges met individual and small unit training needs, "replicat[ing] existing individual-skills training capabilities on Okinawa." Because the ranges "[did] not provide for all requisite collective, combined arms, live, and maneuver training," the relocated Marines would need to travel to "sustain core competencies." Noting that the Marine Corps ultimately hoped to conduct integrated core competency training, the EIS explained that such a decision, along with the "suitability of CNMI to meet" this need, would be reviewed in 2010 during the Quadrennial Defense Review.

Two months later, the Navy published its 2010 Record of Decision declaring its intent to proceed with the relocation to Guam and associated training on Tinian. The Navy deferred its decision to construct the live-fire training facility on Guam until it completed analysis under the National Historic Preservation Act.

In February 2012, the Navy issued an additional Notice of Intent for a supplemental EIS ("Relocation SEIS") to "evaluate the potential environmental consequences that may result from construction and operation of a live-fire training range complex and associated infrastructure on Guam." The Relocation SEIS was to address five alternative sites for the live-fire training range complex on Guam, though its scope was modified in October 2012 to accommodate a reduction in the number of Marines relocating to Guam. In 2015, the Navy issued a Record of Decision for the Relocation SEIS that approved the construction of a live-fire training range complex on Guam at a different location.

While the Navy analyzed new challenges to the Guam relocation, it published yet another Notice of Intent, the CNMI Joint Military Training Environmental Impact Statement/Overseas Environmental Impact Statement ("CJMT Draft EIS"). The draft proposed creating additional range and training areas within the CNMI to address "unfilled unit level and combined level military training requirements in the Western Pacific." Although the Pacific Command previously determined that the CNMI was the "prime location to support forces" throughout the Pacific Command Area of Responsibility, it also concluded that the CNMI had the "greatest number of training deficiencies." The Pacific Command proposed four training range complexes on Tinian and two training range complexes on Pagan, a volcanic island to the north. A deluge of comments followed, and the Navy decided to issue a revised draft with new alternatives and studies. At the time of this appeal, the CJMT Draft EIS was undergoing revision.

*Challenges to the Records of Decision ("ROD").* TWA filed suit to challenge two final agency actions: the

Relocation EIS, memorialized in the 2010 ROD, and the Relocation SEIS, memorialized in the 2015 ROD. Seeking declaratory and injunctive relief, TWA alleged the Navy violated NEPA and the Administrative Procedure Act ("APA") by failing to consider (1) the impact of all mission essential training for Guam-based Marines and (2) stationing alternatives beyond Guam and the CNMI. The district court granted summary judgment on the first claim in favor of the Navy and dismissed TWA's second claim. The court also concluded that the group waived a third claim challenging the Relocation EIS, and denied leave to amend.

## ANALYSIS

### I.  TWA's Procedural Claims Under NEPA

TWA launched a two-pronged attack on the Navy's decision to relocate troops to Guam and construct training facilities on the CNMI. First, it argues the two decisions are "connected actions" that must be assessed in a single EIS. *See* 40 C.F.R. § 1508.25(a)(1).[2]    Alternatively, TWA contends that because the proposed training sites discussed

---

[2] In a footnote, TWA argued that the district court erred in not considering the Siting Study as either part of the administrative record or as extra-record evidence to support this part of its claim. The district court did not abuse its discretion in concluding that the administrative record is complete and excluding this extra-record evidence. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996). TWA failed to demonstrate that the Navy actually considered the Siting Study; the passing reference in the notice of intent is insufficient. *See Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1241 (E.D. Cal. 2013) ("[A]n extra-record document that is cited in the agency's actual decision document indicates consideration of the contents of the extra-record document by the decision-maker. Otherwise, a mere reference in the administrative record is insufficient." (internal quotation marks, emphasis, and alteration omitted)).

in the CJMT Draft EIS will magnify the environmental effect of relocating Marines to Guam, these "cumulative impacts" must be addressed in the Relocation EIS. *See id*. § 1508.25(a)(2).

We review de novo the district court's grant of summary judgment. *See Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). We must uphold the agency's action "unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id*. (quoting 5 U.S.C. § 706(2)(A)).

TWA is correct that connected actions must be considered in a single EIS. Actions are connected if they "[a]utomatically trigger other actions which may require environmental impact statements," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or "[a]re independent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1). However, NEPA does not require an agency to treat actions as connected if they have independent utility and purpose. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006). For instance, "[w]hen one of the actions might reasonably have been completed without the existence of the other, the two actions have independent utility and are not 'connected' for NEPA's purposes." *Id*. This is true even where each action might "benefit from the other's presence," *Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1068 (9th Cir. 1995) (citation omitted), or where the actions have "overlapping, but not co-extensive goals," *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1098 (9th Cir. 2012).

We conclude that the Marine relocation and the placing of training facilities on Tinian are not connected for the

purposes of an environmental impact statement.  The Relocation EIS lays out multiple reasons for the relocation of Marines from Okinawa to Guam: positioning troops to defend the United States and its Pacific territories, providing a powerful presence in the Pacific region, fulfilling a commitment to Japan, and defending American, Japanese, and other allies' interests.  Meanwhile, the CJMT Draft EIS explains the rationale for placing range and training facilities on Tinian and Pagan: they would "reduce joint training deficiencies for military services" and be able to "support ongoing operational requirements, changes to U.S. force structure, geographic repositioning of forces, and U.S. training relationships with allied nations."

Although the two actions have overlapping goals—Marines on Guam will certainly take advantage of the training ranges and facilities in the CNMI—they also have independent utility.  As the district court noted, "the national security and defense goals of the Guam relocation and CJMT proposals are 'overlapping,' but they are not 'co-extensive.'" *See Pac. Coast Fed'n of Fishermen's Ass'ns*, 693 F.3d at 1098.  Nor can we conclude that it would be arbitrary or irrational for the Marines to relocate to Guam and receive part of their required training elsewhere—especially given the current nature of the Marines' training in Okinawa. While it may be more convenient for the Marines to have these training facilities closer, there is no evidence showing they *must* be.

TWA also argues the Navy violated NEPA's mandate that an EIS must consider cumulative impacts.  A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency

(Federal or non-Federal) or person undertakes such other actions."   40 C.F.R. § 1508.7; *see Ecology Ctr. v. Castaneda*, 574 F.3d 652, 666 (9th Cir. 2009).  The rationale for evaluating cumulative impacts together is to prevent an agency from "dividing a project into multiple actions" to avoid a more thorough consideration of the impacts of the entire project.  *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002) (citation omitted).  TWA does not face an "onerous" burden and "need not show what cumulative impacts would occur."  *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010).  Instead, it needs to show "only the potential for cumulative impact."  *Id*.

The district court found TWA met this low burden, but rather than forcing the Navy "to reopen the environmental impact statements related to the relocation efforts," the district court reasonably concluded that the Navy "may address any cumulative impacts in the environmental impact statement for the proposed range and training areas on Tinian and Pagan in [the CJMT Draft EIS]."  TWA argues this deferral to a future EIS was in error.  We disagree.

We have consistently held that agencies can consider the cumulative impacts of actions in a subsequent EIS when the agency has made clear it intends to comply with those requirements and the court can ensure such compliance.  For example, in *Northern Alaska Environmental Center v. Kempthorne*, we concluded an agency did not violate NEPA even where it failed to consider the cumulative impacts of an action for which it had previously issued a notice of intent. *See* 457 F.3d 969, 980 (9th Cir. 2006).  Because the notice of intent had "in effect given notice that [the agency would] consider all impacts," and would include cumulative impacts as part of the future EIS, and because the court could hold

the agency to that promise, it was sufficient for the agency to address the impacts of the future project "at a later stage." *Id*.; *see also Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357–58 (9th Cir. 1994) ("Having persuaded the district court that it understands its duty to follow NEPA in reviewing future site-specific programs, judicial estoppel will preclude the [agency] from later arguing that it has no further duty to consider the cumulative impact of [those] programs."). By issuing a notice of intent to prepare an EIS for the training and ranges in the CNMI, the Navy has "impliedly promised" to consider the cumulative effects of the subsequent action in the future EIS and the Navy should be held to that promise. *Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1010 (9th Cir. 2011). For this reason, we conclude that the Navy's deferral of consideration of the cumulative impacts to a future EIS was not error.

## II. TWA's Claim re Alternatives Beyond Guam and the CNMI

TWA's remaining claim—that the Navy failed to consider stationing alternatives beyond Guam and the CNMI for Marines relocating out of Okinawa—also fails. Relying on both constitutional standing and the political question doctrine, the district court dismissed this claim for a lack of jurisdiction. Reviewing de novo, we affirm. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 (9th Cir. 2007).

Because we resolve this claim on the basis of standing, we need not reach the political question doctrine. *See No GWEN All. of Lane Cnty., Inc. v. Aldridge*, 855 F.2d 1380, 1382 (9th Cir. 1988) ("When both standing and political question issues are before the court, the court should determine the question of standing first."). We note, however, that there is significant overlap between the

principles underpinning the redressability prong of our standing inquiry and the overarching purpose of the political question doctrine. *See Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1192 (9th Cir. 2017) ("Whether examined under . . . the redressability prong of standing, or the political question doctrine, the analysis stems from the same separation-of-powers principle— enforcement of this treaty provision is not committed to the judicial branch. Although these are distinct doctrines . . . there is significant overlap.").

Article III standing demands that TWA establish: (1) it has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

TWA asserts various "cultural, social, economic, recreational, spiritual, education, and other interests" on Guam and the CNMI that will be adversely affected by the Marines relocation to those areas. The procedural requirements that are the cornerstone of NEPA protect these cognizable interests. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) ("NEPA declares a broad national commitment to protecting and promoting environmental quality." (citing 42 U.S.C. § 4331)). In particular, NEPA requires that agencies analyze reasonable alternatives to a proposed action in an EIS, *see* 40 C.F.R. § 1502.14, so that public officials can "make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment," *id*. § 1500.1(c).

TWA's successful showing of a procedural injury lightens its burden on the remaining Article III standing

requirements.  *See Lujan*, 504 U.S. at 572 n.7 (The "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.").  As a plaintiff alleging procedural injury, TWA "need[s] to show only that the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision of whether to take or refrain from taking a certain action."  *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226–27 (9th Cir. 2008).  But even under this more lenient standard, TWA is unable to meet its burden.

TWA correctly identifies its right to a procedurally-sound EIS that serves as a safeguard to its numerous interests on Guam and the CNMI.  But it does not—and cannot—show that this right, if exercised, could protect its concrete interests, because doing so would require us to order the Navy to modify or set aside the Agreement between the United States and Japan.  Regardless of the Navy's analysis of alternate stationing locations for the Marines, it cannot upend that agreement.  Accordingly, we cannot grant relief to TWA without upsetting the agreement to relocate troops from Okinawa to Guam.  *Compare Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 819 (9th Cir. 2017) (concluding environmental group's claims that Navy should consider modifying base replacement plan were "forward-looking" and did not "hinge on upsetting" bilateral agreement with Japan), *with Salmon Spawning*, 545 F.3d at 1227 ("[I]f a court were to give the groups the remedy that they seek . . . the ultimate agency decision of whether to enter into the Treaty . . . could never be influenced.").

TWA's argument is predicated on the belief that its proposed relief would not discharge the treaty itself, but rather would alter the United States' actions within the

treaty's bounds.   Although the agreement between the United States and Japan has been amended in the past to decrease the number of troops relocated to Guam, the resolution TWA seeks would stretch the agreement beyond recognition. The treaty provides that the Marines "and their approximately 9,000 dependents *will* relocate from Okinawa to Guam."  Granting the relief TWA seeks would necessarily rescind the decision to relocate the troops to Guam, resulting in an order to the executive branch to rescind or modify the agreement.  Indeed, even the amended agreement maintains the relocation of thousands of Marines from Okinawa to Guam.  As in *Salmon Spawning*, even if the Navy's action was procedurally flawed, "a court could not set aside the next, and more significant, link in the chain—the United States' entrance into the Treaty."  545 F.3d at 1227.  TWA's second claim is not redressable by the judicial branch and must be dismissed for lack of standing.

## III.    Failure to Supplement Claim

Finally, the parties dispute whether the TWA waived a third claim—that "[d]efendants failed to supplement the Relocation Final EIS after the 2012 Roadmap Adjustments that created 'substantial changes' to the proposed action, such as changes to the exact Marine Corps units that would be relocated and the full-range of weapons, and training in the CNMI, that they would need."

Where a "complaint does not include the necessary factual allegations to state a claim, raising such a claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (en banc).  The district court did not err in concluding that TWA waived this claim.   Potentially relevant facts and regulations are scattered in different parts of the complaint, and a district

court's job is not to piece together a jigsaw puzzle of claims. The ultimate proof is in the pudding: in the delineation of claims for relief at the end of the complaint, TWA lists only two—neither of which is a failure to supplement the Relocation Final EIS.

Because TWA explicitly raised the failure to supplement claim for the first time in summary judgment briefing, more than two years after the litigation commenced and six months after the administrative record was filed, and because it gave no prior notice to the Navy and requested leave to amend only after moving for summary judgment, the district court did not abuse its discretion in denying TWA's request for leave to amend. *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.,* 668 F.2d 1014, 1053 (9th Cir. 1981) (holding that notice is an important factor in considering whether a late shift in the thrust of the case prejudices the other party).

**AFFIRMED.**