# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

INTERNATIONAL LONGSHORE AND )
WAREHOUSE UNION, LOCAL 19, )

               Appellant, )

               v. )

CITY OF SEATTLE, a Washington )
municipal corporation; KING )
COUNTY, a Washington county; and )
WSA PROPERTIES, III, LLC, a )
Delaware limited liability company, )
dba ArenaCo, )

            Respondents. )

No. 70006-5-I

DIVISION ONE

PUBLISHED OPINION

FILED: September 9, 2013

BECKER, J. — Chris Hansen, a private investor and basketball enthusiast, has acquired land on which he proposes to develop and operate a new sports arena south of downtown Seattle near the existing football and baseball stadiums. Hansen approached the city of Seattle and King County proposing that they participate in the development and ownership of the arena on his property. Last December, King County and the city signed a "Memorandum of Understanding" that contemplates the use of public funds for an arena on Hansen's proposed site. The memorandum lays out the particulars of how the venture will be financed and operated if King County and Seattle ultimately decide to participate in it. Environmental review of the proposal as required by the State Environmental Protection Act (SEPA), chapter 43.21C RCW, is currently underway.

In this lawsuit, the International Longshore and Warehouse Union, Local 19 (ILWU), contends that by signing the memorandum before analyzing the environmental consequences of the project, the city and county have illegally stacked the deck in favor of the south Seattle location.

The trial court dismissed the suit on summary judgment. We affirm. The memorandum does not predetermine where an arena will be built or even that an arena will be built at all. Whether the city and county will agree to Hansen's proposal is a decision expressly reserved until after environmental review is complete. Because there has not yet been a government "action" as that term is defined by SEPA, the courts are not a forum for the union's opposition to Hansen's proposal.

## FACTS

In 2011, about three years after Seattle lost the Seattle Supersonics to Oklahoma City, hedge fund manager Chris Hansen approached city and county officials with a plan for an arena that could host professional basketball and hockey teams. The discussions were initially kept confidential. Hansen's company, WSA Properties III LLC, doing business as ArenaCo, bought property in the industrial area south of downtown Seattle. In February 2012, Hansen publicly submitted his proposal to Seattle Mayor Mike McGinn and King County Executive Dow Constantine. Hansen planned to raise over $500 million in private funds to develop the facility, purchase a professional basketball team, and seek a partner to recruit a hockey team. At the time, Hansen hoped to purchase the Sacramento Kings and relocate the team to Seattle.

2

Hansen requested a public investment of $200 million. His proposal included a number of provisions to ensure repayment of the public funds. To facilitate private funding and commitments from the professional sports franchises, Hansen urged the city and county to sign agreements outlining a proposed deal and the process by which the governments would decide whether to participate.

McGinn and Constantine formed a review panel to evaluate the merits of Hansen's proposal. The panel issued a report in April 2012 after four public meetings. In May 2012, McGinn and Constantine presented proposed ordinances to their respective councils seeking authorization to enter into a "Memorandum of Understanding" with ArenaCo.

The preliminary draft of the memorandum set out Hansen's proposed terms for future transactional agreements between ArenaCo, the city, and the county about location, financing, ownership, management, operation, and use of an arena facility. On December 3, 2012, after months of negotiations, revisions, and the passing of ordinances authorizing the agreements, Hansen, McGinn, and Constantine signed the 39-page memorandum of understanding that is at issue in this appeal.

The area in which Hansen's arena would be located is already home to Century Link Field and Safeco Field. The site is just south of the existing stadiums. It is bounded by South Massachusetts Street to the north, First Avenue South to the west, South Holgate Street to the south, and the Burlington Northern Railway to the east. Zoning is industrial commercial, with an 85-foot

height limit. A spectator sports facility is already a permitted use. Hansen proposes an arena with about 700,000 square feet of usable space. The arena would hold between 17,500 and 19,000 attendees for sports or concert events.

The memorandum is a binding agreement as to the process the parties will follow to complete necessary reviews, including environmental reviews, fulfill conditions precedent and, as appropriate, approve the transaction documents defined in the agreement. But many of its terms become obligations of the parties only after several contingencies occur. Future decisions by the city and county whether to invest in Hansen's project site are expressly reserved until *after* review under SEPA. The memorandum makes clear that the city and county will not commit to this project until each has analyzed the environmental impacts of the proposed arena, including "consideration of one or more alternative sites":

> **5.     SEPA.** The Parties acknowledge that the Project is subject to review and potential mitigation under various laws, including the State Environmental Policy Act, Chapter 43.21C of the Revised Code of Washington ("RCW"), and the state and local implementing rules promulgated thereunder (collectively, "SEPA"). Before the City and County Councils consider approval of the Umbrella Agreement and any Transaction Documents, the City and County will complete a full SEPA review, including consideration of one or more alternative sites, a comprehensive traffic impact analysis, impacts to freight mobility, Port terminal operations, and identification of possible mitigating actions, such as improvements to freight mobility, and improved pedestrian connections between the Arena and the International District light rail station, the Stadium light rail station, the SODO light rail station, and Pioneer Square. The City and County anticipate that alternatives considered as part of the SEPA review will include a "no action" alternative and an alternative site at Seattle Center. The City or County may not take any action within the meaning of SEPA except as authorized by law, and nothing in this MOU [memorandum of understanding] is intended to limit the City's or County's exercise of substantive

4

SEPA authority. Consistent with Section 4 of this MOU, ArenaCo will reimburse the City for the costs incurred by the City as part of the SEPA review and will be responsible for funding any required mitigation imposed through SEPA substantive authority.

Memorandum § 5.

Under the memorandum, after the SEPA review, the city and county will decide whether to invest public funds in an arena on Hansen's proposed site. If they decide to proceed, they will commit up to $200 million total, subject to various contingencies. Memorandum § 10. The memorandum contains a variety of financial terms that will govern the parties' relationship if the city and county opt to proceed.

The obligations of the city and county to support Hansen's proposal are expressly limited by several conditions precedent. These include completion of SEPA review through issuance of a final environmental impact statement, obtaining of a master use permit and all other permits necessary for construction of the project, and decisions by the city and county whether, in consideration of the environmental review, it is appropriate to proceed:

> **24. City/County Conditions Precedent.** The obligations of the City and County under this MOU to commit Public Financing are expressly conditioned on the following conditions precedent:
>
> . . . .
>
> **b. SEPA and Permitting.** Before the Umbrella Agreement and Transaction Documents may be authorized as described in Section 24.e below, (i) SEPA review associated with any City or County actions as described in Section 5 of this MOU has been completed through issuance of a Final Environmental Impact Statement; (ii) the master use permit and all other permits required for construction of the Project have been obtained; (iii) the City and County and their respective councils have considered the SEPA review in connection with their respective actions and have determined whether it is appropriate to proceed with or without additional or revised conditions based on the SEPA review; and (iv)

any challenges to the Project have been resolved in a manner reasonably acceptable to the Parties.

Memorandum § 24.b. Other conditions precedent include an economic impact analysis and ArenaCo's securing of a professional basketball franchise. Memorandum § 24.d and g.

The city of Seattle is the lead agency responsible for SEPA review. The city started the environmental review process in October 2012 and shortly thereafter issued a determination of significance requiring the preparation of an environmental impact statement.

On October 23, 2012, ILWU sued to invalidate the memorandum of understanding, naming as defendants the city, the county, and WSA Properties III LLC, doing business as ArenaCo. Local 19 of ILWU represents 3,000 longshoremen who work at the Port of Seattle loading and unloading container cargo and service cruise ships. The union opposes construction of an arena in industrial south Seattle because of concern that the construction and additional traffic will disrupt the movement of freight and drive away maritime business and jobs.

The union alleges that the memorandum is an "action" as SEPA defines that term. The union's complaint asserts that the provisions identifying a specific site and outlining financial terms "will create irreversible political momentum" in favor of Hansen's proposal so that the evaluation of alternatives to his proposal in the currently ongoing environmental review process will be "a sham."

The parties filed cross motions for summary judgment. The court found that the memorandum was not an "action" subject to environmental review under SEPA and dismissed the ILWU lawsuit on February 22, 2013.

On May 15, 2013, while the parties were still in the process of filing appellate briefs, the Board of Governors of the National Basketball Association voted against allowing the Sacramento Kings to be sold to Hansen's group and relocated to Seattle. This event undoubtedly makes resolution of the lawsuit less urgent, but no one has suggested that ILWU's claim is moot. The memorandum states that it is good for five years from the date it was signed.

## DISCUSSION

In reviewing summary judgment, this court's review is de novo. We engage in the same inquiry as the trial court. Clallam County Citizens for Safe Drinking Water v. City of Port Angeles, 137 Wn. App. 214, 219, 151 P.3d 1079 (2007). Summary judgment is proper only if there are no material issues of fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

An environmental impact statement must be prepared for any "major action significantly affecting the quality of the environment." RCW 43.21C.030(c). "Generally, SEPA and its implementing regulations require that the government conduct environmental review, through at least a threshold determination, for any proposal that meets the definition of an action." Pub. Util. Dist. No. 1 of Clark County v. Pollution Control Hearings Bd., 137 Wn. App. 150, 158, 151 P.3d 1067 (2007).

7

Judicial review under SEPA "shall without exception be of the governmental action together with its accompanying environmental determinations." RCW 43.21C.075(6)(c); see also RCW 43.21C.075(1),(2)(a). This means that until an agency has taken final action on a proposal, judicial review of an agency's compliance with SEPA may not occur. State v. Grays Harbor County, 122 Wn.2d 244, 250-51, 857 P.2d 1039 (1993). Requiring parties to wait until a government has taken an "action" before a court may review an appeal brought under SEPA serves the underlying policy of SEPA to avoid piecemeal decision-making. Grays Harbor County, 122 Wn.2d at 250-51. Whether a court can invalidate the memorandum thus hinges on whether the memorandum meets the definition of a government "action."

There are "project actions" and "nonproject actions." WAC 197-11-704(2). "Nonproject actions involve decisions on policies, plans, or programs." WAC 197-11-704(2)(b). For example, the adoption of a comprehensive land use plan and a city's annexation of a certain area are nonproject actions. WAC 197-11-704(2)(b)(ii),(iv). A "project action," on the other hand, must involve "a decision on a specific project":

> (a) **Project actions.** A project action involves a decision on a specific project, such as a construction or management activity located in a defined geographic area. Projects include and are limited to agency decisions to:
> (i) License, fund, or undertake any activity that will directly modify the environment, whether the activity will be conducted by the agency, an applicant, or under contract.
> (ii) Purchase, sell, lease, transfer, or exchange natural resources, including publicly owned land, whether or not the environment is directly modified.

WAC 197-11-704(2)(a).

ILWU claims the memorandum of understanding is a "project action." The memorandum is indeed a decision, but not every decision concerning a project is a "project action." The memorandum does not license, fund, or undertake an activity that will directly modify the environment, nor does it purchase, sell, lease, transfer, or exchange natural resources. Therefore, it does not fit the above definition of a project action. If and when the city and county ultimately decide to give Hansen's proposal the green light, that decision will be a project action. That is why an environmental impact statement is currently being prepared: so that the city and county will have the benefit of a formal environmental analysis and information about reasonable alternatives before deciding whether to give Hansen the green light.

The union contends that signing the memorandum was an "incremental" decision related to the arena and that such incremental decisions also have to undergo an environmental review before the government entities sign on the dotted line. There is simply no support in the SEPA statute or regulations for defining "action" so broadly. To the contrary, regulations under SEPA recognize that "preliminary steps or decisions are sometimes needed before an action is sufficiently definite to allow meaningful environmental analysis." WAC 197-11-055(2)(a)(ii). The memorandum is best understood as a preliminary step taken by the city and county to set forth an arena proposal that is sufficiently definite to allow further study, including preparation of a meaningful environmental impact statement.

ILWU's argument that the memorandum itself is an "action" under state law is rooted in King County v. Washington State Boundary Review Board for King County, 122 Wn.2d 648, 860 P.2d 1024 (1993). In that case, the Supreme Court reversed an annexation decision enlarging the city of Black Diamond because it was not preceded by the preparation of an environmental impact statement. Boundary Review Bd., 122 Wn.2d 648 (1993). In Boundary Review Board, approval of the annexations constituted a nonproject "action." WAC 197-11-704(2)(b)(iv). "Even a boundary change, like the one in this case, may begin a process of government action which can 'snowball' and acquire virtually unstoppable administrative inertia." Boundary Review Bd., 122 Wn.2d at 664. Postponing environmental review risks "'a dangerous incrementalism where the obligation to decide is postponed successively while project momentum builds.'" Boundary Review Bd., 122 Wn.2d at 664, quoting William H. Rodgers, The Washington Environmental Policy Act, 60 Wash. L. Rev. 33, 54 (1984).

> Even if adverse environmental effects are discovered later, the inertia generated by the initial government decisions (made without environmental impact statements) may carry the project forward regardless. When government decisions may have such snowballing effect, decisionmakers need to be apprised of the environmental consequences *before* the project picks up momentum, not after.

Boundary Review Bd., 122 Wn.2d at 664.

The union argues the memorandum was specifically designed to create a snowballing effect and build momentum for Hansen's proposal. The snowballing metaphor is powerful because it embodies the fundamental idea of SEPA: to prevent government agencies from approving projects and plans before the environmental impacts of doing so are understood. But SEPA does not compel

environmental review of a decision that is not an "action." SEPA review must precede approval of an annexation, even though specific development proposals are not yet on the table, because an action has been taken that will have impacts on the environment down the road. SEPA review must precede a decision to go ahead with the arena because if and when that decision is made, the decision will be a project action with immediate environmental impacts. The memorandum of understanding is not an "action" because by itself it has no environmental impact, either down the road or immediately. Under SEPA, there is no snowball. All that has happened so far in terms of SEPA is a decision about the process that will be used to make a decision.

The distinction is illustrated in Magnolia Neighborhood Planning Council v. City of Seattle, 155 Wn. App. 305, 230 P.2d 190, review denied, 170 Wn.2d 1003 (2010). In Magnolia, the city of Seattle approved the Fort Lawton Redevelopment Plan, a plan for construction of residential housing on property the city was acquiring from the federal government. Magnolia, 155 Wn. App. at 310. The city wanted to wait to conduct SEPA review until it actually applied for rezoning or land use permits. This court held that SEPA review was required earlier, before adoption of the redevelopment plan, because the plan was a "project action." Magnolia, 155 Wn. App. at 314. The plan was "binding" on the city once approval by federal agencies was secured. Magnolia, 155 Wn. App. at 317. Even though adopting the plan would not result in immediate land use changes, the City's approval of the plan without first conducting SEPA review

11

was "precisely the type of government decision that would have the 'snowballing effect'" described in Boundary Review. Magnolia, 155 Wn. App. at 317.

Unlike in Magnolia, here the memorandum of understanding does not limit or control future decisions the city and county may be called upon to make. It is not "binding" as that word is used in Magnolia.

The union contends that the memorandum constitutes a preliminary decision to which SEPA must apply because, in the union's view, the memorandum unreasonably limits the alternatives considered in the environmental impact statement to a no-action alternative and Seattle Center. The case on which the union primarily relies for this argument is Public Utility District No. 1, 137 Wn. App. 150 (2007). In that case, the Department of Ecology gave a public utility district a permit for drilling test wells to gather data about contamination, preliminary to the district's pending application to develop a new wellfield near the Columbia River. No one questioned that approving the preliminary permit for test wells was an "action" under SEPA. Pub. Util. Dist. No. 1, 137 Wn. App. at 157, 161 ("parties stipulated that the actions the preliminary permit allows would not have an adverse environmental impact"). Rather, the issue was whether the action of drilling test wells was categorically exempt from SEPA review under WAC 197-11-800(17), which exempts basic information collection and research. The court held the permit was categorically exempt because the main objective was research to determine the effect of the wellfield project on ground water contamination. Pub. Util. Dist. No. 1, 137 Wn. App. at 160.

Then, because the regulation exempting basic research specifically refers to WAC 197-11-070, the court addressed the plaintiffs' claim that the preliminary permit was an action that would "limit the choice of reasonable alternatives" under WAC 197-11-070(1)(b). Pub. Util. Dist. No. 1, 137 Wn. App. at 160-61. Under this regulation, which is entitled "Limitation on actions during SEPA process," agencies must refrain from taking any action that would limit the choice of reasonable alternatives until SEPA review has been completed:

> Until the responsible official issues a final determination of nonsignificance or final environmental impact statement, no *action* concerning the proposal shall be taken by a governmental agency that would:
> (a) Have an adverse environmental impact; or
> (b) Limit the choice of reasonable alternatives.

WAC 197-11-070(1) (emphasis added).

The plaintiffs argued that the test wells, and the cost of conducting the tests, would have a "coercive effect" on Ecology's future decision on the groundwater rights application, thereby limiting the choice of reasonable alternatives. Pub. Util. Dist. No. 1, 137 Wn. App. at 161. The court disagreed, finding that the tests were solely for the purpose of gathering data and the cost was minimal. But the court acknowledged that if the test drilling had forced the utility district to "put all of its financial resources in one project," conceivably the district would become "less inclined to explore alternate sites that could have a lower environmental impact." Pub. Util. Dist. No. 1, 137 Wn. App. at 162.

ILWU argues that unlike the permit for test wells, here the memorandum does have a "coercive effect" upon the city and county officials who, now that they have signed it, will be less inclined to explore alternate sites for the arena.

13

ILWU asserts that the memorandum "was structured to authorize a series of next steps which, when coupled with WSA's anticipated reliance on these steps to the tune of hundreds of millions of dollars, would put enormous political pressure on the Councils' decision to site the Arena in SODO, thereby limiting alternatives."

This argument fails. Unlike the permit for the test wells, the memorandum of understanding is not an "action." The memorandum does not preclude consideration of alternate sites during SEPA review; indeed, it expressly anticipates that the review process will consider at least the alternative of Seattle Center as well as a "no action" alternative. As the trial court noted, there is no other development proposal on the table:

> [T]here wouldn't be any authority to approve elsewhere because nobody's proposed an arena elsewhere, I mean, unless the City or the County were going to build it themselves, which ... at this point they're not proposing to go out and build an arena themselves, regardless of whether there's any private investor or not.

If a proponent for an arena at an alternative location comes forward, the memorandum will not prevent the city and county from evaluating or pursuing the alternative proposal. It keeps the governments' options open while the environmental impact of Hansen's proposal is being studied.

Case law under the National Environmental Protection Act (NEPA) supports our conclusion that the memorandum of understanding is not an "action." Because NEPA is substantially similar to SEPA, we may look to federal case law for SEPA interpretation. Pub. Util. Dist. No. 1, 137 Wn. App. at 158. Under NEPA, agencies must complete environmental review prior to the "go-no go" stage of the project, which is to say before any "'irreversible and irretrievable

14

commitment of resources.'" Metcalf v. Daley, 214 F.3d 1135, 1142, 1143 (9th Cir. 2000), quoting Conner v. Burford, 848 F.2d 1441, 1446 (9th Cir. 1988), cert. denied, 489 U.S. 1012 (1989). Preliminary steps that retain an agency's authority to "change course or to alter the plan it was considering implementing" are not "actions" requiring NEPA environmental review. WildWest Inst. v. Bull, 547 F.3d 1162, 1169 (9th Cir. 2008) (premarking of trees for logging in Bitterroot National Forest did not require NEPA review because it did not irretrievably commit the Forest Service to a course of action).

The court reached a similar result in Center for Environmental Law and Policy v. Bureau of Reclamation, 655 F.3d 1000, 1007 (9th Cir. 2011). In that case, before conducting an environmental assessment, the Bureau of Reclamation signed a memorandum of understanding and obtained two secondary water use permits for a project involving release of water from Lake Roosevelt. Environmental groups filed suit, claiming the Bureau should have done the assessment before taking these preliminary steps. The lawsuit was properly dismissed because the action had not reached the "go-no go stage." The Bureau retained absolute authority to decide whether water from Lake Roosevelt would be committed to the draw-down project until after it published the final environmental assessment. Bureau of Reclamation, 655 F.3d at 1006; see also Friends of S.E.'s Future v. Morrison, 153 F.3d 1059, 1063 (9th Cir. 1998) (preparation of a tentative operating schedule for planned timber supply did not commit the agency to a particular action).

15

The same is true here. The city and county remain free to change course. The memorandum of understanding does not commit them to action.

In summary, the trial court properly concluded that the memorandum of understanding is not an "action" within the meaning of SEPA and judicial review is not available.

Affirmed.

Becker, J.

WE CONCUR: