**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

|                                    |   |                                 |
|------------------------------------|---|---------------------------------|
| CITY OF MUKILTEO and SAVE OUR COMMUNITIES, | ) ) ) | No. 74327-9-I |
|                                    | ) | DIVISION ONE                    |
| Appellants,                        | ) ) |                               |
| v.                                 | ) ) |                               |
| SNOHOMISH COUNTY and PROPELLER AIRPORTS PAINE FIELD LLC, | ) ) ) ) | UNPUBLISHED FILED: January 23, 2017 |
| Respondents.                       | ) ) ) |                             |

COX, J. — The City of Mukilteo and Save Our Communities (collectively "Mukilteo") appeal the order granting summary judgment to Propeller Airports Paine Field LLC (Propeller) and Snohomish County.[1] We hold that there are no genuine issues of material fact for trial. The County and Propeller are entitled to judgment as a matter of law. We affirm.

Snohomish County owns and operates Paine Field, an airport. Paine Field does not currently provide scheduled commercial passenger air service. Propeller seeks to develop commercial airline service facilities at Paine Field,

---

[1] We adopt the naming conventions of the parties.

consisting of a two-gate terminal. Propeller sought an option to lease a portion of airport property to conduct feasibility studies for this development.

In February 2015, the County executive submitted to the County council an Executive/Council Approval Form, recommending the approval of an option to lease agreement. The option grants Propeller the contractual right to enter certain airport property to conduct engineering studies, subject to the terms and conditions of the option. One of these express conditions to the option is that its exercise is "subject to compliance with RCW 43.21C, the State Environmental Policy Act ('SEPA')."[2]

Exhibit B to the option is the proposed lease form to be executed should the option be exercised. Pursuant to the express terms of the option, "execution of [this] Lease [is] subject to compliance with RCW 43.21C, the State Environmental Policy Act ('SEPA')."[3]

In March 2015, the County authorized the execution of the option. Soon after, Mukilteo sought judicial review of this decision and declaratory relief. Specifically, Mukilteo sought an order declaring the option void. It also sought to enjoin the County from entering into a binding option or lease for commercial air service facilities at Paine Filed before completing an adequate environmental impact statement (EIS).

Mukilteo also argued that the County violated Snohomish County Code (SCC) 15.04.040(3). This claim is based on the County executive's alleged

---

[2] Clerk's Papers at 78.

[3] Id.

2

failure to include with his recommendation a statement evaluating the relative merits of available options to the proposed option to lease.

The trial court granted summary judgment to the County and Propeller, rejecting Mukilteo's claims.

Mukilteo appeals.

## OPTION TO LEASE

Mukilteo first argues that the County's execution of the option is subject to SEPA and that the County was required to complete a SEPA review before executing the option to lease. We disagree.

A threshold issue, over which the parties differ, is the standard of review that we must apply. Mukilteo contends that the de novo standard of review applies. Propeller argues that the clearly erroneous standard controls. We hold that under either standard of review, the questions before us are legal in nature. There simply are no material disputed facts. De novo review controls.[4]

Here, the County approved an option to lease airport property to Propeller. If and only if Propeller exercises the option in accordance with its terms does Propeller's ability to lease the property arise. A condition precedent to both the exercise of the option and the execution of the lease is "compliance with RCW 43.21C, the State Environmental Policy Act ('SEPA')."[5] In the absence of this compliance, there can be no exercise of the option and no lease. Thus, the legal

---

[4] Blackburn v. Dep't of Social and Health Services, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016).

[5] Clerk's Papers at 78.

3

question is whether SEPA bars the approval of the option to lease on the basis of these undisputed facts.

*Project Action*

Mukilteo next argues that SEPA requires the County to complete an EIS prior to executing the option because it is a "project action." Because execution of the option to lease is not a project action, we reject this argument.

SEPA requires the preparation of an EIS for any "major actions significantly affecting the quality of the environment."[6] "'SEPA and its implementing regulations require that the government conduct environmental review, through at least a threshold determination, for any proposal that meets the definition of an action.'"[7]

Under SEPA, we review "'the governmental action together with its accompanying environmental determinations.' This means that until an agency has taken final action on a proposal, judicial review of an agency's compliance with SEPA may not occur."[8]

Whether we may invalidate the option to lease depends on whether this option meets the definition of government "action." Such action is reviewable as a project action, which is defined as:

---

[6] RCW 43.21C.030(c); Int'l Longshore & Warehouse Union, Local 19 v. City of Seattle, 176 Wn. App. 512, 519, 309 P.3d 654 (2013).

[7] Int'l Longshore & Warehouse Union, Local 19, 176 Wn. App. at 519 (quoting Pub. Util. Dist. No. 1 of Clark County v. Pollution Control Hr'gs Bd., 137 Wn. App. 150, 158, 151 P.3d 1067 (2007)).

[8] Id. (citations omitted) (quoting RCW 43.21C.075(6)(c)).

4

> [A] decision on a specific project, such as a construction or management activity located in a defined geographic area. Projects include and are limited to agency decisions to:
>
> . . . .
>
> (ii) **Purchase, sell, lease, transfer, or exchange** natural resources, including publicly owned land, whether or not the environment is directly modified.[9]

Two cases are instructive in determining whether the option is a project action. In <u>Magnolia Neighborhood Planning Council v. City of Seattle</u>, the City of Seattle sought to acquire federal real property and began the approval process for residential development of the property.[10] The City approved this plan, but it indicated that it would delay SEPA compliance until it actually applied for rezoning or land use permits.[11] The Magnolia Neighborhood Planning Council sued the City, arguing that it violated SEPA.[12]

This court affirmed the trial court's conclusion that the City's plan constituted a project action under WAC 197-11-704(2)(a)(ii) because it constituted an agency decision to purchase, sell, lease, transfer, or exchange publicly owned land.[13] This court also determined that the plan is "a decision on a specific construction project, located in a defined geographic area."[14]

---

[9] WAC 197-11-704(2)(a) (emphasis added).

[10] <u>Magnolia Neighborhood Planning Council v. City of Seattle</u>, 155 Wn. App. 305, 308-10, 230 P.3d 190 (2010).

[11] <u>Id.</u> at 311.

[12] <u>Id.</u>

[13] <u>Id.</u> at 309, 314.

[14] <u>Id.</u> at 314.

Additionally, this court determined that the City's approval of the plan had a "binding effect" because it required that the City make a specific use of the property once the federal government adopted the plan as a condition of transfer of the property.[15] Lastly, this court concluded that the plan constituted a project action under WAC 197-11-704(1)(a), which is not at issue here.[16]

Although the City argued that it might not follow through with the intended usage envisioned in the plan, we concluded that "environmental review can be required even when the government has not made a definite proposal for actual development of the property at issue."[17] Thus, "the proposed land use related action approved in the [plan] does not evade SEPA review simply because the approval of the [plan] does not result in immediate land use changes."[18]

Conversely, in International Longshore & Warehouse Union, Local 19 v. City of Seattle, this court determined that a memorandum of understanding did not constitute a project action.[19] There, King County and the City of Seattle signed a memorandum of understanding that contemplated the use of public funds for an arena on certain property.[20] The memorandum remained "good" for five years and provided the particulars of how the venture would be financed and

---

[15] Id. at 317.

[16] Id. at 318.

[17] Id. at 316.

[18] Id. at 317.

[19] 176 Wn. App. 512, 520, 309 P.3d 654 (2013).

[20] Id. at 514.

6

operated if King County and Seattle ultimately decide to participate in it.[21] Many of the terms became the parties' obligations only after several contingencies occurred, including the completion of SEPA review through the issuance of a final EIS.[22] Specifically, the memorandum provided that "after the SEPA review, the city and county w[ould] decide whether to invest public funds in an arena on [the] proposed site. If they decide to proceed, they will commit up to $200 million total, subject to various contingencies."[23]

The International Longshore and Warehouse Union, Local 19 (ILWU) commenced the suit to invalidate the memorandum.[24] This court determined that the memorandum did not constitute a project action, because it, by itself, had "no environmental impact, either down the road or immediately. . . . All that has happened so far in terms of SEPA is a decision about the process that will be used to make a decision."[25] This court explained:

> The memorandum is a binding agreement as to the process the parties will follow to complete necessary reviews, including environmental reviews, fulfill conditions precedent and, as appropriate, approve the transaction documents defined in the agreement. But many of its terms become obligations of the parties only after several contingencies occur. Future decisions by the city and county whether to invest in [the] project site are expressly reserved until after review under SEPA. The memorandum makes clear that the city and county will not commit to this project until

---

[21] Id. at 514, 519.

[22] Id. at 517.

[23] Id.

[24] Id. at 518.

[25] Id. at 522.

each has analyzed the environmental impacts of the proposed arena, including "consideration of one or more alternative sites[.]"[26]

More importantly, this court stated:

The memorandum does not predetermine where an arena will be built or even that an arena will be built at all. Whether the city and county will agree to [the] proposal is a decision expressly reserved until after environmental review is complete. Because there has not yet been a government "action" as that term is defined by SEPA, the courts are not a forum for the union's opposition to [the] proposal.[27]

This court further stated that the memorandum "does not limit or control future decisions the city and county may be called upon to make. It is not 'binding' as that word is used in Magnolia."[28] Rather, the memorandum "is best understood as a preliminary step taken by the city and county to set forth an arena proposal that is sufficiently definite to allow further study, including preparation of a meaningful environmental impact statement."[29]

Here, the option does not constitute a project action under WAC 197-11-704(2)(a)(ii). The option is not a decision to "[p]urchase, sell, lease, transfer, or exchange natural resources, including publicly owned land, whether or not the environment is directly modified."[30] Rather, the option grants Propeller a contractual right to enter the airport property to conduct feasibility studies and the

---

[26] Id. at 516.

[27] Id. at 514.

[28] Id. at 523.

[29] Id. at 521.

[30] WAC 197-11-704(2)(a)(ii).

right to exercise the option to lease the property at a later time. In short, it precedes the possibility that a lease may follow.

Importantly, the option is not a project action because it is similar to the memorandum of understanding discussed in Int'l Longshore & Warehouse Union, Local 19. Like the memorandum in that case, the option "is a binding agreement as to the process the parties will follow" during the option's term.[31]

The option provides that it "may be exercised following completion of environmental review as provided in paragraph 7 . . . ."[32] Paragraph 7 states that the "[e]xercise of the Option *and* execution of the lease are subject to compliance with RCW 43.21C . . . ('SEPA')."[33]

Further, the option provides:

County agrees to process SEPA in a timely fashion. In the event the SEPA, process, or the decision making authority of the Director of Planning & Development Services, is not completed prior to expiration of the Term through no fault of Propeller, at Propeller's election, the Term of this Option shall be automatically extended for consecutive two (2) month periods until such SEPA review and/or decision making process has been completed.[34]

The terms of the option make clear that Propeller can neither exercise the option nor execute the lease until the completion of "a SEPA process."[35] This contractual provision is an express condition precedent to exercise of the option. Thus, the County's execution of the option "is best understood as a preliminary

---

[31] Int'l Longshore & Warehouse Union, Local 19, 176 Wn. App. at 516.

[32] Clerk's Papers at 77.

[33] Id. at 78 (emphasis added).

[34] Id. at 79.

[35] Id. at 78.

9

step taken by the [C]ounty to set forth [a lease] that is sufficiently definite to allow further study, including preparation of a meaningful environmental impact statement."[36] Whether Propeller decides to exercise the option and then execute the lease are "decision[s] expressly reserved until after environmental review is complete."[37] Thus, the County's execution of the option does not constitute a project action.

Mukilteo argues that the option is a project action under WAC 197-11-704(2)(a)(ii) because it is a decision to enter into a lease. Not so.

This argument mischaracterizes the distinctive legal natures of the option to lease and the lease itself. They are not the same.

An option conveys no legal or equitable interest in the real property that is the subject of the option prior to its exercise.[38] It is merely a contractual right to be exercised in accordance with its terms.[39]

In contrast, a leasehold is an estate in land, giving a tenant the right of possession of the real property during the term of the lease.[40] Thus, a lease is not merely a contractual right but an estate in land.

In this case, Exhibit B to the option is the unsigned proposed lease that would be executed upon exercise of the option in accordance with the terms of

---

[36] Int'l Longshore & Warehouse Union, Local 19, 176 Wn. App. at 521.

[37] Id. at 514.

[38] See 11 DAVID A. THOMAS, THOMPSON ON REAL PROPERTY § 96.05(b), at 582-83 (3d ed. 2015).

[39] See Pardee v. Jolly, 163 Wn.2d 558, 568, 182 P.3d 967 (2008).

[40] See 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 6.2, at 310 (2d ed. 2004).

the option. Attaching this exhibit to the option is necessary to comply with the requirements for specific performance of a contract to lease real property.[41] Other than the requirement of specificity just explained and the statute of frauds for certain agreements regarding real property, the lease has no other present effect. It may only have a future effect when and if SEPA compliance is met prior to both the exercise of the option and signing of the lease by the parties.

Accordingly, Mukilteo's contention that the option is a decision to enter into a lease is not helpful to a proper analysis of whether approval of the option is a project action. It is not a lease and it is not any of the other types of transactions that the plain words of the statute specify. And the option is merely a contract, giving no present rights in the property described in Exhibit B to the option.

Mukilteo also relies on Columbia Riverkeeper v. Port of Vancouver USA[42] and Magnolia Neighborhood Planning Council to argue that the option still constitutes a project action, even if it is a preliminary step to entering into the lease. It claims the option represents a decision on a specific construction and operation project in a specific location. Mukilteo also relies on the "binding" terminology used in those cases to further argue that the County committed itself to entering into the lease and "has no option to not sign the [l]ease as [it] is, if

---

[41] Kruse v. Hemp, 121 Wn.2d 715, 722-23, 853 P.2d 1373 (1993) ("A contract to enter into a future contract (*i.e.*, an option contract) must specify all of the material and essential terms of the future contract before a court may order specific performance.") (citing Hubbell v. Ward, 40 Wn.2d 779, 785, 246 P.2d 468 (1952)).

[42] 189 Wn. App. 800, 357 P.3d 710 (2015), review granted sub nom. Columbia Riverkeeper v. Port of Vancouver, 185 Wn.2d 1002 (2016).

11

Propeller decides to go ahead with its plans."[43] Reliance on those cases is misplaced because they are distinguishable.

In Columbia Riverkeeper, the Port executed a lease agreement, and Division Two of this court stated that "upon certification by the Council[,] the lease agreement essentially will be binding on the Port."[44] And in Magnolia Neighborhood Planning Council, the City's redevelopment plan constituted "an agency decision to purchase, sell, lease, transfer, or exchange publicly owned land . . . ."[45] This court also stated that the City's approval of the plan had a "binding effect" because once adopted by the federal government as a condition of transfer of the property, it would bind the City as to its use of that property.[46]

Here, even if we assume that the option involves a decision on a specific project in a defined geographic area under WAC 197-11-704(2)(a), the option is not a lease, sale, transfer, or purchase agreement. And WAC 197-11-704(2)(a) states that "Projects *include and are limited to* agency decisions to . . . [p]urchase, sell, lease, transfer, or exchange natural resources, including publicly owned land, whether or not the environment is directly modified."[47] That is not the nature of this transaction in this case. Thus, this option does not fall within this definition while the actions taken in Columbia Riverkeeper and Magnolia Neighborhood Planning Council did.

---

[43] Brief of Appellants at 26; see also Reply Brief of Appellants at 16.

[44] Columbia Riverkeeper, 189 Wn. App. at 813-15.

[45] Magnolia Neighborhood Planning Council, 155 Wn. App. at 314.

[46] Id. at 317.

[47] (Emphasis added.)

12

Mukilteo also attempts to distinguish the memorandum of understanding in Int'l Longshore & Warehouse Union, Local 19 from the option in this case. Mukilteo specifically argues that the option "does not establish a process to make a future decision" regarding the lease terms or whether to lease Paine Field.

While the memorandum of understanding is not an option to lease property, the underlying principles of Int'l Longshore & Warehouse Union, Local 19 control here. The memorandum provided that "[f]uture decisions by the city and county whether to invest in [the] project site are expressly reserved until after review under SEPA."[48] And this court stated that "[t]he memorandum makes clear that the city and county will not commit to this project until each has analyzed the environmental impacts of the proposed arena . . . ."[49]

Similarly, in this case, the option explicitly provides that "a SEPA process must be completed prior to [the] exercise of the option and execution of the [l]ease."[50] Thus, the option makes clear that Propeller cannot exercise the option and execute the lease without first complying with a condition precedent to performance: completion of "a SEPA process."[51]

Mukilteo also argues that the memorandum of understanding "did not represent a definite proposal that could be sufficiently reviewed" while the lease

---

[48] Int'l Longshore & Warehouse Union, Local 19, 176 Wn. App. at 516 (emphasis omitted).

[49] Id.

[50] Clerk's Papers at 78.

[51] Id.

"already exists" in this case and may be "reviewed at this stage."[52] But the existence of an unsigned lease attached to the option is immaterial. The option to lease is at issue in this case, not the lease, which may never be signed by the parties.

Lastly, Mukilteo relies on National Environmental Policy Act (NEPA) cases to support its argument, where federal courts have held that an agency must prepare an environmental assessment "before 'making an irreversible and irretrievable commitment of resources.'"[53] Whether an agency action constitutes an irreversible and irretrievable commitment of resources turns on whether that action "'reserve[s] to the government the absolute right' to prevent the use of the resources in question."[54]

Mukilteo relies on these cases to argue that the option is subject to environmental review. It specifically argues that once Propeller executes the option, the County "will have no choice but to execute the lease, despite the information developed during the SEPA process," because the option does not "reserve any authority . . . to the County Council to reject or modify the lease based upon the environmental review."[55]

But as previously stated, the issue is whether the County improperly executed the option without first preparing an EIS, not whether the County

---

[52] Brief of Appellants at 28-29.

[53] Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation, 655 F.3d 1000, 1006 (9th Cir. 2011) (quoting Metcalf v. Daley, 214 F.3d 1135, 1143 (9th Cir. 2000)).

[54] Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1063 (9th Cir. 1998) (alteration in original) (quoting Conner v. Burford, 848 F.2d 1441, 1449 (9th Cir. 1988)).

[55] Brief of Appellants at 31.

14

retains authority after Propeller exercises the option and executes the lease. What happens after Propeller exercises the option upon completion of the "SEPA process" is immaterial to what is presently before this court.

Further, the County's decision to execute the option does not constitute an irreversible and irretrievable commitment of resources because the option grants Propeller only "an exclusive right and option to negotiate and enter into a lease of the [p]roperty."[56] Under the option, the County "agrees that it will not initiate, solicit, negotiate, or pursue with any third party any inquiry, proposal or offer relating to sell, agree to sell, transfer, lease, assign or encumber the [p]roperty except with respect to a [l]ease transaction with Propeller."[57] This demonstrates that the County has not committed any resources to Propeller and need not reserve the absolute right to prevent the use of the property at issue.

In sum, the approval of the option to lease is not a project action, either under the plain words of the statutes or controlling case law. We reject the arguments to the contrary.

### SEPA Exemption

Mukilteo also argues that the County's decision to execute the option is not exempt from SEPA compliance under WAC 197-1-800(5)(c) because the property's use will change. We disagree.

WAC 197-11-800 provides categorical exemptions from threshold determinations and the EIS requirement, subject to WAC 197-11-305. WAC 197-

---

[56] Clerk's Papers at 77.

[57] Id.

11-800(5)(c) pertains to certain real property transactions that are exempt, such as:

> [l]easing, granting an easement for, or **otherwise authorizing the use of real property** when the **property use** will remain essentially the same as the existing use for the term of the agreement . . . .[58]

Here, the option to lease falls squarely within the above emphasized language. It is neither a lease nor an easement. The contract does give Propeller the authority to enter the property to conduct the feasibility studies defined in the option. But the property use remains unchanged. This falls expressly within the exemption.

Mukilteo argues that the property use will change. In doing so, it misapplies controlling law. As we previously discussed in this opinion, the option to lease does not create an interest in the airport property. The option is merely a contract that may give rise to the later execution of a lease in the form of Exhibit B to the option to lease.

Nevertheless, Mukilteo argues on the basis of potential changes in the property's use if Propeller ever executes the **lease**, following timely exercise of the option. Specifically, Mukilteo focuses on the lease terms and argues that the "use of the public property subject to the Lease will change drastically."[59] For instance, Mukilteo asserts that the construction and operation of a commercial passenger terminal "is not 'essentially the same' as the property's current use as

---

[58] (Emphasis added.)

[59] Brief of Appellants at 33.

a paved lot."[60] While this may be true, it is also immaterial. That is because this argument focuses on what may happen after a lease is executed, not what happens during the term of the option.

The lease is not at issue in this case. The question is whether the use of the property will remain essentially the same as the existing use during the *option's* term, not the lease term. Because there is no dispute that the terms of the option do not change the use of the property during the option's duration, the exemption under WAC 197-11-800(5)(c) applies. But the exemption application is subject to the terms of the exception to the exemption that we next address.

### Exception to SEPA Exemption

Mukilteo next argues that the option to lease is not exempt from SEPA under WAC 197-11-305(1)(b)(i). We again disagree.

WAC 197-11-305(1) states, in relevant part:

> If a proposal fits within any of the [exemption] provisions . . . , the proposal *shall* be categorically exempt from threshold determination requirements . . . *except* as follows: . . . (b) The proposal is a segment of a proposal that includes (i) A series of actions, physically or functionally related to each other, some of which are categorically exempt and some of which are not . . . .
> . . . .[61]

According to WAC 197-11-305(1), SEPA will apply if the "total effect" of a series of related actions "creates [a] probability of significant adverse environmental impact."[62]

---

[60] Id.

[61] (Some emphasis added.)

[62] 24 TIM BUTLER & MATTHEW KING, WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 19.24, at 291 n.1 (2d ed. 2007).

17

Mukilteo specifically argues that the "[o]ption, the [l]ease, subsequent project permits, and ultimately, the construction and operation of the terminal and other related facilities" are a series of actions fundamentally related to each other.[63] It further argues that the "decisions to approve permits for construction and operation of a new commercial passenger terminal are not categorically exempt from SEPA."[64] Thus, it argues that the option is not exempt from SEPA.

The County and Propeller do not address this argument. But we do.

As WAC 197-11-305(1) makes clear, the purpose of the exception is to preclude those related actions, the "total effect" of which creates a "probability of significant adverse environmental impact."[65] As we see it, this regulation is not intended to be an exception that swallows the rule of exemption that would otherwise apply.

To read this regulation as Mukilteo suggests necessarily would require that we conclude that there is a probability of significant adverse environmental impact on this record. The undisputed fact is that compliance with SEPA is a condition precedent both to exercise of the option and to execution of the lease that may follow. Mukilteo's effort to avoid the distinctions between the option to lease and the lease to require a premature SEPA examination is unpersuasive.

---

[63] Brief of Appellants at 36.

[64] Id.

[65] 24 WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 19.24 at 291 n.1.

*Snowball Effect*

Mukilteo also argues that the County's decision to execute the option "improperly builds momentum" towards "subsequent permit decisions."[66] We disagree.

In King County v. Boundary Review Board for King County, the supreme court explained that "[o]ne of SEPA's purposes is to provide consideration of environmental factors at the earliest possible stage to allow decisions to be based on complete disclosure of environmental consequences."[67] The court further explained how decisions impact this purpose:

> Decision-making based on complete disclosure would be thwarted if full environmental review could be evaded simply because no land-use changes would occur as a direct result of a proposed government action. Even a boundary change, like the one in this case, may begin a process of government action which can "snowball" and acquire virtually unstoppable administrative inertia. Even if adverse environmental effects are discovered later, the inertia generated by the initial government decisions (made without environmental impact statements) may carry the project forward regardless. When government decisions may have such snowballing effect, decision-makers need to be apprised of the environmental consequences before the project picks up momentum, not after.[68]

Mukilteo relies on this statement to argue that the County's decision to execute the option "and its attendant [l]ease" "improperly builds momentum" towards "subsequent permit decisions."[69] It further argues that "SEPA's objective

---

[66] Brief of Appellants at 41-42.

[67] King County v. Wash. State Boundary Review Bd. for King County, 122 Wn.2d 648, 663, 860 P.2d 1024 (1993).

[68] Id. at 664 (citation omitted).

[69] Brief of Appellants at 37, 41-42.

to assure fully informed decisions by completing environmental review as early as possible will not be attained" if we affirm the trial court's decision.

But in Int'l Longshore & Warehouse Union, Local 19, this court concluded that the memorandum of understanding "[wa]s not an 'action' because by itself it ha[d] no environmental impact, either down the road or immediately. Under SEPA, there is no snowball. All that has happened so far in terms of SEPA is a decision about the process that will be used to make a decision."[70]

Similarly, we conclude "there is no snowball [effect]" in this case.[71] All that has happened is the County's decision to execute an option, which may result in a lease. The option specifically provides that a SEPA process must be completed prior to the exercise of the option and execution of the lease that may follow.

We note that Mukilteo fails to claim any environmental impact resulting from the County's execution of the option to lease. Rather, Mukilteo alleges "significant adverse impacts to the surrounding community" resulting from the *lease*. This again illustrates Mukilteo's failure to distinguish between the two documents and their legal effect.

Where a proposed action "'change[s] neither the actual current uses to which the land was put nor the impact of continued use on the surrounding environment,' that action is not a major action significantly affecting the

---

[70] 176 Wn. App. at 522.

[71] Id.

20

environment and an EIS is not required."[72]  Because Mukilteo fails to show that the option either changes the current use of the property or impacts the continued use on the surrounding environment, we reject its argument.

*Reasonable Alternatives*

Mukilteo argues that the County violated WAC 197-77-070 because the option "limited the choice of reasonable alternatives available to [the County]." We disagree.

WAC 197-11-070 applies during the SEPA review process before an EIS is issued.[73]  In relevant part, WAC 197-11-070(1)(b) provides that "[u]ntil the responsible official issues a final determination of nonsignificance or final environmental impact statement, no action concerning the proposal shall be taken by a governmental agency that would . . . [l]imit the choice of reasonable alternatives."  WAC 197-11-070 also provides that it does not preclude developing plans or securing options "as long as such activities are consistent with subsection (1)."[74]

A reasonable alternative is "an action that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation.  Reasonable alternatives may be

---

[72] Chuckanut Conservancy v. Wash. State Dep't of Nat. Res., 156 Wn. App. 274, 285, 232 P.3d 1154 (2010) (quoting ASARCO Inc. v. Air Quality Coal., 92 Wn.2d 685, 706, 601 P.2d 501 (1979)).

[73] Pub. Util. Dist. No. 1 of Clark County, 137 Wn. App. at 161.

[74] WAC 197-11-070(4).

those over which an agency with jurisdiction has authority to control impacts, either directly, or indirectly through requirement of mitigation measures."[75]

Here, the parties dispute whether the option limits the County's choice of reasonable alternatives during SEPA review.

This court concluded that the memorandum of understanding for an arena in Int'l Longshore & Warehouse Union, Local 19 did not limit the city's and county's choice of alternatives.[76] We determined that the memorandum "d[id] not preclude consideration of alternate sites during SEPA review; indeed, it expressly anticipates that the review process will consider at least the alternative of [the] Seattle Center as well as a 'no action' alternative."[77] We further stated that "[i]f a proponent for an arena at an alternative location comes forward, the memorandum will not prevent the city and county from evaluating or pursuing the alternative proposal. It keeps the governments' options open while the environmental impact of [the] proposal is being studied."[78]

The reasoning in Int'l Longshore & Warehouse Union, Local 19 applies in this case. The option grants Propeller the right to enter the property to conduct studies, at Propeller's cost, to determine the property's suitability for Propeller's proposed use. Further, the option requires that "a SEPA process" be completed before Propeller can exercise the option and execute the lease. Nothing in the

---

[75] WAC 197-11-786.

[76] 176 Wn. App. at 525.

[77] Id.

[78] Id.

record suggests that the County's execution of the option would coerce it to execute the proposed lease with Propeller simply because the County executed the option agreement.

Additionally, the option does not explicitly preclude or limit the County's consideration of alternatives available for Paine Field. The option specifically provides that if Propeller does not execute and deliver the proposed lease in order to exercise the option, the County and Propeller may "subsequently negotiat[e] and execut[e] a lease of the [p]roperty on terms acceptable to both parties." It is also possible that Propeller and the County will not to enter into a lease at all if the SEPA process is not completed, or if Propeller does not exercise the option or execute the lease. Thus, nothing in the option coerces the County to execute the proposed lease with Propeller.

In sum, the option does not violate WAC 197-11-070(1)(b) because it does not "limit the choice of reasonable alternatives" available to the County during SEPA review. Further, WAC 197-11-070(4) states that it does not preclude developing plans or securing options "as long as such activities are consistent with subsection (1)."[79] Because the County secured the option with Propeller, which does not "limit the choice of reasonable alternatives" available to the County during SEPA review, WAC 197-11-070(1)(b) does not apply to prohibit the County's execution of the option.

Mukilteo argues that "upon entering into the [o]ption, the County no longer has the option of not entering into the [l]ease. If Propeller exercises its option

---

[79] WAC 197-11-070(4).

23

rights, the County will be legally bound to enter into the [l]ease."[80] Mukilteo also states that the County may only enter into a lease "that is substantially in the form of the lease attached to the [o]ption."[81] Thus, Mukilteo argues that the option "absolutely limits the choice of reasonable alternatives available" to the County.[82]

But as previously discussed, it is possible that Propeller and the County will not enter into a lease if Propeller does not exercise the option and execute the lease. Thus, it is not true that the County no longer has the choice of not entering into the lease just by executing the option agreement.

Mukilteo also asserts that "[t]o argue that the County['s] *lease* decision does not predispose or coerce the subsequent permitting decision ignores land use permitted and political realities."[83] Mukilteo further argues that alternatives "are now unavailable to the County—regardless of any information later generated in the SEPA process—because the terms of the [l]ease are set in stone."[84] But Propeller has neither exercised the option nor executed the lease. Thus, the lease and subsequent permitting decisions allegedly coerced from the lease are not at issue.

---

[80] Reply Brief of Appellants at 13.

[81] Id.

[82] Id. at 12-13.

[83] Id. at 18-19 (emphasis added).

[84] Brief of Appellants at 40.

*Proprietary Decision*

Mukilteo argues that SEPA applies to all agency actions, including proprietary actions. We agree.

In the order granting summary judgment, the trial court stated:

> Mukilteo further asserts that the proprietary arm of the County, in entering into the Option Agreement, will not have the benefit of [the] County's regulatory SEPA review. While this argument may be true, it exceeds the scope of this Court's legal review of whether or not the County violated SEPA when it executed the Option Agreement.[85]

The County and Propeller do not contest Mukilteo's assertion. We assume there is no basis to do so and agree with Mukilteo on this point.

Because WAC 197-11-704 does not differentiate between regulatory and proprietary actions, there is no basis in the statutory language for making this distinction. Thus, we conclude that SEPA applies to proprietary agency decisions.

## SNOHOMISH COUNTY CODE

Mukilteo finally argues that the County violated SCC 15.04.040(3) "by taking action" on the option without providing a statement of available options. Although the County did not expressly comply with this ordinance, it did so substantially. There was no error requiring reversal.

Washington courts interpret statutes to determine and apply the legislature's intent.[86] The legislature's intent is solely derived "from the statute's

---

[85] Clerk's Papers at 651.

[86] See Segura v. Cabrera, 184 Wn.2d 587, 593, 362 P.3d 1278 (2015).

25

plain language, considering the text of the provision at issue . . . ."[87] We must "look to the statute's plain and ordinary meaning, reading the enactment as a whole, [and] harmonizing its provisions by reading them in context with related provisions."[88] We must also avoid absurd results when interpreting statutes.[89]

Statutory interpretation is a question of law that we review de novo.[90] These same principles apply to interpretation of county ordinances.[91]

SCC 2.10.010(12) governs the County's "[a]pproval of all licenses to occupy, use or access the Snohomish County Airport and all airport leases."[92] It states, in relevant part:

> [I]n accordance with SCC 15.04.040, the county executive may recommend individual licenses or leases for approval by the council, and shall recommend in such detail as the council may require proposed rates, terms and forms of leases to be approved by the executive . . . . Any lease or license executed pursuant to this section shall be deemed to be with the approval of the county council as required by chapter 15.04 SCC.[93]

---

[87] Id. at 591.

[88] Id. at 593.

[89] State v. Larson, 184 Wn.2d 843, 851, 365 P.3d 740 (2015).

[90] W. Plaza, LLC v. Tison, 184 Wn.2d 702, 707, 364 P.3d 76 (2015).

[91] Ellensburg Cement Prods., Inc. v. Kittitas County, 179 Wn.2d 737, 743, 317 P.3d 1037 (2014).

[92] http://www.codepublishing.com/WA/SnohomishCounty/html1113/SnohomishCounty02/SnohomishCounty0210.html#2.10.010 (last visited January 3, 2017). SCC 2.10.010(12) is now SCC 2.10.010(14) on the Snohomish County Code website. The language has remained the same. For consistency with the parties' briefs, this opinion will continue to refer to SCC 2.10.010(12).

[93] SCC 2.10.010(14), http://www.codepublishing.com/WA/SnohomishCounty/html1113/SnohomishCounty02/SnohomishCounty0210.html#2.10.010 (last visited January 3, 2017).

26

SCC 15.04.040 governs the airport manager's authority and states that "the airport manager shall be the executive manager of the airport and shall be responsible for the management and operation of the airport . . . ."[94] SCC 15.04.040(3) provides:

> Any matter relating to management or operation of the airport that is presented to the county council for action by or through the airport manager or executive, including but not limited to individual licenses or leases of airport property or proposed rates, terms or forms of leases to be approved by the executive under SCC 2.10.010(14), **shall** be accompanied by a statement of the options that are available to the council, **a written evaluation of their relative merits**, and a written recommendation by the executive for council action.[95]

Here, no written evaluation of the relative merits of available options to the proposal accompanied the council executive's approval recommendation. The question is what effect the absence of such documentation has on the County's decision to approve the option to lease certain airport property.

Substantial compliance may be found "where there has been compliance with the statute albeit with procedural imperfections."[96] Under the substantial compliance doctrine, a party complies with statutory requirements by satisfying "'the substance essential to the purpose of the statute.'"[97] This court "may invoke

---

[94] SCC 15.04.040(1), http://www.codepublishing.com/WA/SnohomishCounty/html/SnohomishCounty15/Snoho mishCounty1504.html#15.04.040 (last visited January 3, 2017).

[95] http://www.codepublishing.com/WA/SnohomishCounty/html/SnohomishCounty15/Snoho mishCounty1504.html#15.04.040 (last visited January 3, 2017) (emphasis added).

[96] Cont'l Sports Corp. v. Dep't of Labor & Indus., 128 Wn.2d 594, 602, 910 P.2d 1284 (1996).

[97] In re Estate of Burton v. Didricksen, 189 Wn. App. 630, 637, 358 P.3d 1222 (2015) (quoting Crosby v. Spokane County, 137 Wn.2d 296, 302, 971 P.2d 32 (1999)).

the doctrine where a party has 'substantially complied with the requirements crucial to the underlying design intended by the legislature.'"[98]

Here, the record demonstrates the County's substantial compliance with SCC 15.04.040(3) due to the briefings evidenced in Bill Dolan's declaration, discussed below. Surely, the County would have asked for more information if it felt that alternatives were not explored.

Dolan, Deputy Director-Airfield at Paine Field, testified in his declaration that the "executive and airport staff discussed various alternatives of accommodating commercial air service at Paine Field . . . in public and executive session[s] with the [C]ounty council . . . ."[99] Dolan further testified that the evaluation of alternatives included "the risks and advantages of a county-built terminal, an airline-built terminal, public-private partnerships, and a lease to a [third] party as proposed by Propeller. The executive provided updates to council at public and executive sessions regarding the status of air service negotiations with Propeller."[100]

Dolan also testified that "the executive and airport staff informed council in executive session that the terms of the option with Propeller kept [C]ounty financial and operational risk to a minimum, required environmental review

---

[98] Id. (quoting Murphy v. Campbell Inv. Co., 79 Wn.2d 417, 422, 486 P.2d 1080 (1971)).

[99] Clerk's Papers at 659.

[100] Id.

before a lease could be signed[,] and was consistent with the [C]ounty's federal grant obligations."[101]

According to Dolan, the County had this information because the "executive and airport staff discussed various alternatives of accommodating commercial air service at Paine Field . . . in public and executive session[s] with the [C]ounty council . . . ."[102] Dolan also specifically identified the alternatives, such as "a county-built terminal, an airline-built terminal, public-private partnerships, and a lease to a [third] party as proposed by Propeller."[103] Because the County had this information, this discussion satisfied "'the substance essential to the purpose of [SCC 15.04.040(3)].'"[104]

While there was a technical noncompliance with SCC 15.04.040(3) and Mukilteo seeks to void the option, it cites no authority that would require us to void the County's actions. Accordingly, we decline to do so.

We affirm the order granting summary judgment.

_Cox, J._

WE CONCUR:

_Trickey, ACJ_

_Schindler, J_

---

[101] Id.

[102] Id.

[103] Id.

[104] Burton, 189 Wn. App. at 637 (quoting Crosby, 137 Wn.2d at 302).